# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

JASON PATTON, )
    Plaintiff, )
        v. )    C.A. No. N12C-01-177 CLS
24/7 CABLE COMPANY, LLC, )
    Defendant/Third-Party Plaintiff, )
DANELLA LINE SERVICES )
COMPANY, INC., )
    Defendant/Third-Party )
    Defendant/Fourth-Party Plaintiff, )
MELCAR, LTD., INC., MALEC )
CONSTRUCTION COMPANY, LLC, )
a Pennsylvania LLC, and SUSSEX )
PROTECTION SERVICE, LLC, )
    Defendants/Fourth-Party )
    Defendants, )
24/7 MID-ATLANTIC NETWORK, )
LLC, 24/7 FIBER NETWORK, )
LEVEL 3 COMMUNICATIONS, )
INC., and FIBERTECH NETWORKS, )
LLC, )
    Defendants, )
        v. )
DOUGLAS C. RILEY, )
    Third-Party Defendant. )

## **ORDER**

On this 31st day of August, 2016, and upon Defendant Melcar Ltd., Inc.'s ("Melcar") Motion for Summary Judgment, it appears to the Court that:

1. This is a negligence action brought by Plaintiff Jason Patton ("Plaintiff"). Plaintiff filed this negligence action against nine defendants, including Melcar, seeking recovery for injuries he sustained on June 10, 2011, resulting from a motor vehicle collision between Plaintiff and Douglas Riley ("Riley") in the vicinity of a construction site on Route 13 in New Castle, Delaware. Plaintiff alleges that the collision was caused, *inter alia*, by Sussex's failure to protect against and/or warn of the dangerous condition created by the construction activities in the median of Route 13, including the failure to close the crossover, or median break, connecting the northbound and southbound lanes of Route 13 and failure to use a flagger, and that Sussex is liable for his injuries, because it had control of the roadway in the area in which the collision occurred and was responsible for the work it subcontracted to perform, for taking all reasonable safety precautions at the worksite to protect the public, and for complying with the construction permit issued by the Delaware Department of Transportation ("DelDot").

2. The Parties have stipulated to the following facts:[1] At all times relevant, Defendant Danella Line Services Company, Inc. ("Danella") was hired as the general contractor to provide Fibertech Networks, LLC

---

[1] *See* Stipulation of Facts (Trans. ID 58234718).

("Fibertech") with a conduit for fiber optic cable along a distance of Route 13 to connect to a splice box under the median of Route 13. Fibertech obtained Permit No. NC-072-MIS (the "Permit") in furtherance of this project. Danella subcontracted portions of the work to three subcontractors, who are also defendants, which include Melcar (directional drilling), Sussex Protection Service, LLC, and Malec Construction Company, LLC (backhoe work). At approximately 9:15 pm on the evening of June 10, 2011, as work was being performed by Danella and several other contractors pursuant to the Permit, third-party defendant Riley drove his Dodge Durango with his wife and two sons on the median break, which had not been closed, from northbound Route 13 in an attempt to cross over the southbound lanes to reach a parking lot on the other side, and stopped at the stop sign before driving across. Plaintiff was driving his motorcycle on southbound Route 13 when the collision between him and Riley occurred. As a result of this collision, Plaintiff suffered injuries.

3. On August 31, 2015, Melcar moved for summary judgment on Plaintiff's claims, arguing that there is no genuine issue of material fact that could prevent summary judgment on its behalf, because there is no evidence that Melcar owed any duty of care or proximately caused the accident. Specifically, Melcar argues that it cannot be contended that, by virtue of its

subcontract, it assumed responsibility for the safety of the entire jobsite and, absent any evidence that it exercised actual control over or otherwise assumed responsibility for the crossover, there is no basis for imposing such a duty on it. Therefore, without any affirmative duty regarding the setup of the job or to close the crossover, Melcar is not responsible for the alleged dangerous condition. As to proximate cause, Melcar argues that there is no evidence in the record that its equipment obstructed any of the drivers' views or that anything it did or did not do proximately caused the accident.

4.     Plaintiff opposes Melcar's Motion on the basis that Melcar contractually assumed responsibility for the work area, including ensuring the safety of workers and the public, for complying with all applicable safety rules and permits, and for indemnification of Danella, as the general contractor, for injuries. Plaintiff contends that, at the time of the collision and during the time the worksite was set up, Melcar was working in violation of the Permit and should have closed the crossover pursuant to DelDOT's case seven traffic control plan cited in the Permit. Therefore, there are genuine issues of material fact with respect to control and responsibility of the jobsite, which must go to the jury.

5.     On July 12, 2016, at the request of the Court, the Parties submitted supplemental memoranda to assist the Court in determining, *inter alia*, the

4

issue of duty. Melcar argues that it had no duties beyond those established by its subcontract with Danella, which duties were limited to performing the directional boring under Route 13 and assuming responsibility for only the safety hazards it created by performing such work. On the other hand, Plaintiff argues that Melcar's construction equipment used in the median impaired the public's view in using the crossover and that Melcar assumed greater responsibilities than simply performing the directional boring, including the duty to take all reasonable safety precautions with respect to its work and to comply with all safety requirements.

6. The Court may grant summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law."[2] The moving party bears the initial burden of showing that no material issues of fact are present.[3] Once such a showing is made, the burden shifts to the non-moving party to demonstrate that there are material issues of fact in dispute.[4] In considering a motion for summary judgment, the Court must view the record in a light most favorable to the non-moving

---

[2] Super. Ct. Civ. R. 56(c); *Burkhart v. Davies*, 602 A.2d 56, 59 (Del. 1991).
[3] *Moore v. Sizemore*, 405 A.2d 679, 680 (Del. 1979).
[4] *Id.* at 681.

party.[5]  The Court will not grant summary judgment if it seems desirable to inquire more thoroughly into the facts in order to clarify the application of the law.[6]  Where the defendant's legal obligation arises by way of contract, summary judgment is improper "where reasonable minds could differ as to the contract's meaning, a factual dispute results and the fact-finder must consider extrinsic evidence."[7]

7.      It is well-established that in order to maintain an action sounding in negligence that a plaintiff must demonstrate that (i) the defendant owed the plaintiff a duty of care; (ii) that the defendant breached that duty; and (iii) that the defendant's breach was the proximate cause of the plaintiff's injury.[8]  If the plaintiff fails to makes out a prima facie case of negligence, the defendant is entitled to judgment as a matter of law.[9]  A defendant owes the plaintiff a duty of care where the defendant was under a legal obligation to protect the plaintiff from the risk of harm which caused the plaintiff's injuries.[10]  "[W]hether a duty exists is entirely a question of law, to be

---

[5] *Burkhart*, 602 A.2d at 59.

[6] *Ebersole v. Lowengrub*, 180 A.2d 467, 470 (Del. 1962); *Phillip-Postle v. BJ Prods., Inc.*, 2006 WL 1720073, at *1 (Del. Super. Apr. 26, 2006).

[7] *Spence v. Layaou Landscaping, Inc.*, 2013 WL 6114873, at *5 (Del. Super. Oct. 31, 2013) (quoting *GMG Capital Invest., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 783 (Del. 2012)).

[8] *Pipher v. Parsell*, 930 A.2d 890, 892 (Del. 2007) (citing *New Haverford P'ship v. Stroot*, 772 A.2d 792, 798 (Del. 2001)).

[9] *Id.*

[10] *Id.*; *Thurmon v. Kaplin*, 1999 WL 1611327, at *2 (Del. Super. Mar. 25, 1999).

6

determined by reference to the body of statutes, rules, principles and precedents which make up the law; and it must be determined by the court."[11]

8. In the case *sub judice*, Plaintiff alleges that Melcar, a subcontractor hired by the general contractor pursuant to a subcontract, was negligent. Delaware courts have consistently held that, generally, "it is the scope of the undertaking, as defined in the contract, which gives shape to the independent contractor's duty in tort."[12] Apart from the contract, where a subcontractor exercises actual control over a job site, the law will impose a duty on it to act as a reasonable contractor in providing services necessary for the protection of the traveling public within the construction zone.

9. Plaintiff has presented no evidence to support its assertion that Melcar exercised actual control over the job site; thus, the scope of Melcar's duties is defined solely by its subcontract with Danella.

10. "Under Delaware law, the interpretation of a contract is a question of law only if the terms of the agreement are plain and unambiguous."[13] Where the contract's terms are clear and unambiguous, such that a reasonable

---

[11] *Pipher*, 930 A.2d at 892 (citations omitted).
[12] *Spence*, 2013 WL 6114873, at *3 (citing *Brown v. F.W. Baird, LLC*, 2008 WL 324661, at *3 (Del. 2008)).
[13] *Jordan v. E.I. Du Pont de Nemours & Co.*, 1991 WL 18108, at *1 (Del. Super. Feb. 8, 1991) (citing *Klair v. Reese*, 531 A.2d 219 (1987) (relying on Restatement (Second) of Contracts, § 212 (1981)).

person in the position of either party would have no expectations inconsistent with the contract language, the Court will interpret them according to their ordinary meaning.[14] An ambiguity exists not because the parties disagree as to the proper construction of a term but when the provisions in controversy are fairly susceptible of different interpretations or may have two or more different meanings.[15] Further, "[w]hen interpreting a contract, the Court will give priority to the parties' intentions as reflected in the four corners of the agreement" by construing the agreement as a whole, giving effect to all provisions therein.[16] Thus, it is axiomatic that "[t]he meaning inferred from a particular provision cannot control the meaning of the entire agreement if such an inference conflicts with the agreement's overall scheme or plan."[17]

11.     Though Plaintiff repeats *ad nauseum* that pursuant to the Master Subcontract for Construction Work, Defendant Melcar is as responsible under the Master Contract with Fibertech as the Contractor, Danella, is, simply saying the words does not make it so.[18] The actual "duty" provisions

---

[14] *GMG*, 36 A.3d at 780.

[15] *Id.* (citations omitted).

[16] *Id.* (citing *E.I. du Pont de Nemours & Co., Inc. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985)).

[17] *Id.*

[18] *See* Pl.'s Opp. ¶¶ 13, 14, 15, 18, 19 (Trans. ID 58320609); Pl.'s Supp. Resp. in Opp. 5-6 (Trans. ID 59265006).

at issue in Melcar's Master Subcontract for Construction Work with Danella state, in pertinent part, as follows:

"2. All construction projects for which [Danella] engages [Melcar] to perform Work . . . shall be subject to the terms of this Master Subcontract, and each of the following: (i) The 'Standard Terms and Conditions' attached hereto as Exhibit 'A', and (ii) a Work Order, in the form attached hereto as Exhibit 'B' or any similar writing signed by [Danella] and [Melcar] . . . .[19]

"Exhibit A: 1.1 The Master Subcontract Documents consist of: (a) The Master Subcontract, (b) The contract or other agreement (the "Prime Contract") between [Danella] and [Fibertech], including any and all Contract Documents enumerated therein, including any and all General, Special, Supplementary, and other Conditions thereto or thereof, and any and all Exhibits thereto, and any and all Drawings, Specifications, and Addenda issued prior to execution of the Prime Contract."[20]

"Exhibit A.: 2.1 [T]o the extent that provisions of the Prime Contract shall apply to the Work, . . . [Melcar] shall assume toward [Danella] all obligations and responsibilities which [Danella] assumes toward [Fibertech] under the Prime Contract, subject to the restrictions and limitations of the Prime Contract, and only insofar as any of the foregoing are applicable to the Master Subcontract."[21]

"Exhibit A: 3.1 [Melcar] shall execute the Work, including performing the labor, supervision and other services, and

---

[19] Pl.'s Opp., Exh. H, Master Subcontract for Construction Work Between Melcar and Danella ("Subcontract"), at ¶ 2.

[20] *Id.* at § 1.1. To the extent that Plaintiff impliedly references this section to support his assertion that Danella's Master Agreement with Fibertech and all permits and specifications were incorporated specifically into Melcar's subcontract, because Plaintiff fails to demonstrate how the Court should find that the Permit was specifically incorporated into Melcar's subcontract with Danella, the Court cannot find as a matter of law that Melcar was responsible for notifying DelDot that construction was taking place on the night in question pursuant to this section alone.

[21] *Id.* at § 2.1.

providing the equipment, tools, and materials as required by each Work Order and the Master Subcontract Documents, and as reasonably inferable therefrom, in order to achieve the results intended thereby."[22]

"Exhibit A: 3.2    [Melcar] agrees to perform the Work under the direction of [Danella] . . . and to perform the Work in strict conformity with the requirements of the Master Subcontract Documents."[23]

"Exhibit A: 5.1    [Melcar] shall commence the Work when directed by [Danella] or when otherwise required by the Work Order."[24]

"Exhibit A: 14.2   In performing the Work hereunder, [Melcar] shall be an independent contractor maintaining control over and having sole responsibility for [Melcar's] employees and other personnel."[25]

"Exhibit A: 14.7 [Melcar] shall take all reasonable safety precautions with respect to the Work, and shall comply with all Legal Requirements pertaining to, or the safety of persons or property, and comply with any safety rules, measures or policies initiated by [Danella] or [Fibertech] (collectively, "Safety Requirements").    [Melcar] shall assume full responsibility for compliance with all Safety Requirements, and shall bear all costs and damages attributable to any failure to so comply, and shall indemnify and hold harmless [Danella] . . . for all costs, losses, and expenses, incurred by any of them . . . . [Melcar] shall report immediately to [Danella] any injury to any of [Melcar's] employees or damage to any property on or about the Project Site."[26]

---

[22] *Id.* at § 3.1.

[23] *Id.* at § 3.2.

[24] *Id.* at § 5.1.

[25] *Id.* at § 14.2.

[26] *Id.* at § 14.7.   To the extent that Plaintiff impliedly references this section to support his assertion that the Permit constitutes a "legal requirement" pertaining to the work, because it is undisputed that Melcar is an independent contractor under its Subcontract, Melcar is responsible

12. It is undisputed that Melcar was responsible for performing the directional drilling, or boring, required to build the conduit for Fibertech's fiber optic cable project along Route 13. However, Plaintiff's assertion that, by virtue of its subcontract, Melcar undertook the same amount of responsibility as did Danella as the general contractor for the safety of the traffic controls utilized throughout the construction project, as well as for warning the public of the dangers presented by the construction taking place in the median, is belied by the plain language of the subcontract itself.[27] First, § 2.1 of Exhibit A clearly states that Melcar shall assume toward Danella all obligations and responsibilities which Danella assumes toward Fibertech under their Master Agreement only insofar as such obligations and responsibilities are application to Melcar's Master Subcontract. Therefore, Melcar did not assume responsibility for safety of the entire job site, but rather assumed responsibility for safety of the Work it subcontracted to perform. To impose any greater duty upon Melcar is not reasonably inferable therefrom and, thus, was not contemplated by the Subcontract. Second, § 14.2 of Exhibit A clearly states that Melcar is an independent

_____

only for the work it contracted to perform and, thus, is entitled to rely on Danella's compliance with the Permit when directed to perform work by Danella.

[27] To the extent that Plaintiff refers to the indemnification provisions in Melcar's Subcontract with Danella for support of its argument regarding the duties Melcar owed to him, such provisions are irrelevant as Plaintiff is not a party to the Subcontract and, thus, the Court declines to consider them here.

contractor, and § 3.2 offers further support of this specific relationship between Danella and Melcar by requiring Melcar to perform the work under the direction of Danella.

13. Furthermore, because it is undisputed that Melcar was hired as an independent contractor under the Subcontract to perform only the directional drilling and that Melcar agreed to perform the work under the direction of Danella pursuant to the Subcontract, any argument that § 14.7 imposes a duty on Melcar to ensure that the entire construction project was in compliance with the Permit fails as a matter of law.

14. However, because it is undisputed Melcar was hired to perform the directional drilling necessary to provide Fibertech with a conduit for its fiber optic cable along Route 13 and that Melcar was performing the work at the time of the collision, the responsibility assumed by Melcar pursuant to § 14.7 to take all reasonable safety precautions with respect to its work is implicated to the extent that Plaintiff alleges that Melcar was negligent in performing the work it contracted to do. This contractual duty is similar to the common law duty Delaware law imposes on a contractor to perform tasks with reasonable care.[28] Therefore, to be clear, as Melcar did not assume the same amount of responsibility for job site safety as did Danella,

---

[28] *See Thurmon*, 1999 WL 1611327, at *2 ("It is possible that a legal obligation could arise pursuant to a contractor's common-law duty to perform tasks with reasonable care.").

12

Melcar's liability is limited to whether it took all reasonable safety precautions with respect to its work—not with respect to the entire job site.

15.     The Parties have directed the Court to consider its holding in *Thurmon v. Kaplin*, as it involved a motor vehicle collision that occurred in a construction zone.[29] The plaintiff alleged negligence by the contractor, who had been hired by DelDOT to mill and repave the road, and by the subcontractor, who had been hired by the contractor to apply temporary striping to the road, for failing to provide temporary striping and arrows and to close the turn lane.[30] According to the record, the subcontractor had no decision-making authority as to the striping, acted only pursuant to instructions from DelDOT and/or the contractor, and its work was closely inspected every day, requiring specific approval before it could leave the jobsite.[31] The Court found that, in the absence of any evidence suggesting that the subcontractor exercised actual control over or otherwise assumed responsibility for the area in question, there was no basis to impose a duty on the subcontractor and, thus, only the contractor had assumed the responsibility of protecting the traveling public in the construction zone.[32]

---

[29] *Id.* at *1.
[30] *Id.*
[31] *Id.*
[32] *Id.* at *3.

13

16. The terms of Melcar's Master Subcontract for Construction, as discussed *supra*, make *Thurmon* distinguishable at this stage of the proceedings, because Plaintiff has alleged negligence against Melcar arising out of Melcar's drilling activities in the median on the night in question. Though Melcar has presented evidence that DelDot inspectors had no issue with Melcar's set up on the night in question, whether Melcar complied with the applicable standard of care under the circumstances is for the jury to decide.[33] Furthermore, Melcar's assertion that there is no evidence that Melcar had either personnel or equipment at the site of the accident is contradicted by the record, which suggests that Melcar was drilling in the median on the night in question.[34] Therefore, because the record contains disputed facts as to whether Melcar's acts or omissions at the worksite violated the responsibilities it assumed in the Master Subcontract for Construction Work, and, if so, whether these acts or omissions proximately caused Plaintiff's injuries, summary judgment is not appropriate at this time.

---

[33] *See Hallmon v. C. Raymond Davis & Sons, Inc.*, 2006 WL 1134763, at *3 (Del. Super. Mar. 20, 2006) ("Issues of negligence are ordinarily decided by the jury and summary judgment should only be granted in negligence actions where the undisputed facts compel one conclusion.").

[34] Pl.'s Ltr to Court dated Mar. 28, 2016, Exh. A., Deposition of Robert L. Guldin, at 22:19-23:9 (Trans. ID 58776196).

17. For the foregoing reasons, Melcar's Motion for Summary Judgment is

**DENIED**.

**IT IS SO ORDERED.**

*/s/Calvin L. Scott*

The Honorable Calvin L. Scott, Jr.

cc: Prothonotary